# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| THE OHIO CASUALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:10-CV-300-TLS |
| | ) | |
| LAURA HERRING-JENKINS, Personal Representative of the Estate of Christopher D. Jenkins, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On March 16, 2010, Christopher D. Jenkins was struck and killed by an uninsured motorist while working to repair potholes in a construction lane on Interstate 80 in Indiana. The Plaintiff, Ohio Casualty Insurance Company, insured the dump truck Jenkins was working behind when he was hit. Ohio Casualty has filed a Complaint for Declaratory Judgment requesting that the Court declare that its policies do not provide coverage for the claims of Defendant Laura Herring-Jenkins, who is representing Jenkins's Estate. The Defendant has filed a counter-claim seeking a declaration that coverage is afforded under these same policies. Both parties have filed motions for summary judgment, which are fully briefed. The disputed issues of law are whether Jenkins was "using" or "occupying" the insured vehicle at the time of the accident so as to be an "insured" under the business automobile insurance policy issued by Ohio Casualty, and, if he was not an insured, whether Ohio Casualty was nonetheless required by statute to extend uninsured motorist coverage to Jenkins.

## BACKGROUND

On July 26, 2010, Ohio Casualty filed its Complaint for Declaratory Judgment against Defendant Laura Herring-Jenkins, the personal representative of the Estate of Christopher D. Jenkins. According to the Complaint, the Defendant had asserted a claim for uninsured motorist benefits under business automobile and umbrella policies issued by Ohio Casualty to C. Lee Construction Services for the wrongful death of Jenkins. The Complaint alleges that no coverage was afforded under either policy, and requests that the Court enter judgment declaring the same. On September 27, the Defendant filed an Answer to Complaint for Declaratory Judgment, and on March 31, 2011, filed an Amended Answer and Counterclaim. The Defendant's Counterclaim for Declaratory Judgment asks the Court to enter judgment declaring that coverage is afforded under the business automobile policy and the umbrella policy, and to award compensatory damages. On April 20, Ohio Casualty answered the counterclaim.

On June 7, Ohio Casualty and the Defendant filed their respective motions for summary judgment [ECF Nos. 25 & 27] and briefs in support [ECF Nos. 26 & 28]. The Motions have been fully briefed and are ripe for this Court's consideration.

## STATEMENT OF FACTS

Jenkins was a foreman for Walsh Construction Company (Walsh). According to a Subcontract Agreement between Walsh and C. Lee Construction Services (C. Lee), C. Lee furnished a driver and a dump truck for use by Jenkins and other Walsh employees to go back and forth to job sites on Interstate 80.

On March 16, 2010, C. Lee assigned its employee, Ronald Teslow, to drive Jenkins to and

from the I-80 work site where Jenkins's crew would be filling potholes. Teslow first met Jenkins and another Walsh crew member named Eugene at a staging area where Jenkins and Eugene shoveled cold patch material into the back of the C. Lee dump truck. Eugene and a third Walsh employee rode to the I-80 work site in a Walsh truck known as a Crash Attenuator Truck. At the job site, Jenkins and Eugene exited the vehicles to repair potholes. They walked a couple feet behind the C. Lee truck shoveling cold patch material from the back of the truck into potholes. When they were finished repairing the potholes on a particular section of road, Jenkins directed Teslow to drive to the next pothole, either with hand signals or, if Teslow did not see Jenkins's signals, verbally. The third Walsh crew member drove the Crash Attenuator Truck behind Eugene and Jenkins as a protective barrier. Warning lights, directional arrows, and barrels all acted to direct traffic out of the lane where the crew worked.

After working three or four hours, the crew broke for "lunch," around midnight. Jenkins rode with Teslow in the C. Lee truck to a truck stop where they ate inside the truck. After lunch, Teslow drove Jenkins back to the interstate and they resumed filling potholes. About an hour and one-half into their work, Robert Anthony Shannon (Shannon) drove through a clearly marked construction zone and hit and killed Jenkins, who had been walking behind and to the left of the C. Lee dump truck as it was moving to the next section of road for repair. As a result, Shannon was convicted, by a guilty plea entered pursuant to a plea agreement, of a Class C Felony, Reckless Operation of a Vehicle in a Highway Work Zone Causing Death.

Shannon was uninsured at the time of the accident. Jenkins's estate, through its personal representative Laura Herring-Jenkins, has asserted an uninsured motorist claim under the terms of a primary business automobile insurance policy issued by Ohio Casualty to C. Lee, and under the

terms of a commercial umbrella policy issued by Ohio Casualty to C. Lee.

Business Automobile Insurance Policy No. BAO 54439084 (the Policy), with a coverage period of March 15, 2010, to March 15, 2011, provides uninsured motorist coverage with limits of $1 million per accident. The Policy covers all sums that "an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance, or use of a covered 'auto.'" (Policy, Section II-Liability Coverage, A., ECF No. 28-5 at 25.) C. Lee is an insured under the Policy, as is "[a]nyone else while using with [C. Lee's] permission a covered 'auto' [C. Lee] own[s]." (*Id.* A.1.a & b(1).) This definition of an insured excludes anyone, other than C. Lee employees, partners, members, or a "lessee or borrower or any of their 'employees,' while moving property to or from a covered 'auto.'" (*Id.* A.1.b(4).) The C. Lee dump truck that Teslow was driving on March 16, 2010, when Jenkins was killed was a covered auto under the Policy.

Under the terms of the Uninsured Motorist Coverage Endorsement (the UIM Endorsement) to the Policy, Ohio Casualty agreed to "pay all sums the insured is legally entitled to recover as compensatory damages from the owner or driver of an uninsured motor vehicle" if such damage results from "[b]odily injury sustained by the insured and caused by an accident, with an uninsured motor vehicle." (Endorsement 1, ECF No. 28-6 at 13 (quotation marks omitted).) According to the UIM Endorsement, an "insured" includes anyone "occupying" a covered auto. Occupying is defined as "in, upon, getting in, on, out or off." (Endorsement 1 & 3, ECF No. 28-6 at 13 & 15.)

The Commercial Umbrella Policy that Ohio Casualty issued to C. Lee for the period March 15, 2009, to March 15, 2010, provided excess coverage for the business automobile Policy. The Umbrella Policy excludes coverage for any obligation of the insured under any uninsured or

underinsured motorist law. (Umbrella Policy, Section IV.D, ECF No. 18-3).

## ANALYSIS

**A.      Standard of Review**

The Federal Rules of Civil Procedure state that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). With cross motions, the court must construe all facts in a light most favorable to the party against whom the motion under consideration is made. *See Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003).

In deciding what insurance coverage, if any, the Plaintiff is entitled to, the Court must apply Indiana law for contract interpretation. *Allstate Ins. Co. v. Keca*, 368 F.3d 793, 796 (7th Cir. 2004) ("A federal court sitting in diversity has the obligation to apply the law of the state as it believes the highest court of the state would apply it if presented with the issue."); *State Farm Mut. Auto Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001) ("When the state Supreme Court has not decided the issue, the rulings of the state intermediate appellate courts must be accorded great weight, unless there are persuasive indications that the state's highest court would decide the case differently."). An insurance contract "is subject to the same rules of interpretation as are other

contracts." *Morris v. Econ. Fire & Cas. Co.*, 848 N.E.2d 663, 666 (Ind. 2006) (citing *USA Life One Ins. Co. of Ind. v. Nuckolls*, 682 N.E.2d 534, 537–38 (Ind. 1997)). As with other contracts, the interpretation of an insurance contract is a question of law. *Briles*, 858 N.E.2d at 213; *see also Cinergy Corp. v. Associated Elec. & Gas Ins. Servs.*, 865 N.E.2d 571, 574 (Ind. 2007). Accordingly, questions as to the interpretation of an insurance policy are "particularly well-suited for summary judgment." *Argonaut Ins. Co. v. Jones*, 953 N.E.2d 608, 614 (Ind. Ct. App. 2011) (citing *Adkins v. Vigilant Ins. Co.*, 927 N.E.2d 385, 389 (Ind. Ct. App. 2010)).

In reviewing policy terms, the court construes them "from the perspective of an ordinary policyholder of average intelligence." *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 246–47 (Ind. 2005) (quoting *Burkett v. Am. Family Ins. Group*, 737 N.E.2d 447, 452 (Ind. Ct. App. 2000)). If the contract language is clear and unambiguous, it should be given its plain and ordinary meaning. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992); *Newnam Mfg., Inc. v. Transcont'l. Ins. Co.*, 871 N.E.2d 396, 401 (Ind. Ct. App. 2007). "Insurance companies are free to limit their liability, so long as they do so in a manner consistent with public policy as reflected by case or statutory law." *Gheae v. Founders Ins. Co.*, 854 N.E.2d 419, 423 (Ind. Ct. App. 2006). Thus, "[a]n insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer's liability." *Amerisure, Inc. v. Wurster Const. Co., Inc.*, 818 N.E.2d 998, 1002 (Ind. Ct. App. 2004). Moreover, interpretation should harmonize the policy's provisions rather than place its provisions in conflict. *Allgood*, 836 N.E.2d at 247. Where an ambiguity exists, the policy is generally construed in favor of the insured. *Nuckolls*, 682 N.E.2d at 538. This is particularly the case where a policy excludes coverage. *Id.*; *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945 (Ind. 1996). However, when a case involves a dispute between a third party and an insurer, the court

does not construe it strictly against the insurer, but determines the general intent of the contract

from a neutral stance. *Burkett v. Am. Family Ins. Group*, 737 N.E.2d 447, 452 (Ind. Ct. App. 2000);

*Ind. Lumbermens Mut. Ins. Co. v. Statesman Ins. Co.*, 291 N.E.2d 897 (1973). In addition, an

ambiguity does not exist simply because an insured and an insurer disagree about the meaning of a

provision, but only if reasonable people could disagree about the meaning of the contract's terms.

*Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002); *Bosecker v. Westfield Ins. Co.,* 724

N.E.2d 241, 244 (Ind. 2000) ("An ambiguity exists where a provision is susceptible to more than

one interpretation and reasonable persons would differ as to its meaning.").

The insured is required to prove that its claims fall within the coverage provision of the

policy, but the insurer bears the burden of proving specific exclusions or limitations to policy

coverage. *See Erie Ins. Group. v. Sear Corp.*, 102 F.3d 889, 892 (7th Cir. 1996) (applying Indiana

law).


**B.      Uninsured Motorist Coverage Under the Policy and the UIM Endorsement**

The Defendant argues that Jenkins is entitled to uninsured motorist coverage if he fits either

the definition of insured provided in the UIM Endorsement or in the Policy. The UIM Endorsement

defines an "insured," in relevant part, as "Anyone occupying a covered auto." The term

"occupying" is defined as "in, upon, getting in, on, out or off." Under the Policy's liability

provision, the term "insured" is defined as "Anyone . . . while using with your permission a

covered 'auto' you own." "Using" is not defined in the Policy.

To support her position that Jenkins is entitled to uninsured motorist coverage if he

qualifies as an insured under either the UIM Endorsement or the liability provision of the Policy,

the Defendant relies on the following reasoning from *Smith v. Allstate Ins. Co.*, 681 N.E.2d 220

(Ind. Ct. App. 1997):

> The purpose of uninsured motorists insurance is to place the insured in substantially the same position as if the other party had complied with the minimum requirements of the insurance statutes. *Whitledge v. Jordan*, 586 N.E.2d 884, 886 (Ind. Ct. App.1992), trans. denied. Attempts to limit or diminish the uninsured motorists protection required by statute [are] against the public policy of this state. *American States Ins. Co. v. Braden*, 625 N.E.2d 1252, 1257 (Ind. Ct. App.1993), trans. dismissed. However, our courts have uniformly held that public policy is not violated unless "the policy specifically limits uninsured motorist coverage as to persons who would otherwise qualify as insureds for liability purposes." *Whitledge*, 586 N.E.2d at 887. Restated, if a person qualifies as an insured under the liability section of the policy, he must also qualify under the uninsured motorists section or the insurance contract violates public policy. *Connell v. American Underwriters, Inc.*, 453 N.E.2d 1028, 1031 (Ind. Ct. App. 1983), trans. denied.

681 N.E.2d at 222; *see also Harden v. Monroe Guar. Ins. Co.*, 626 N.E.2d 814, 819 (Ind. Ct. App.

1993) (stating that language in an insurance policy that limits or diminishes protection required by

the uninsured motorist statute is contrary to public policy only if it specifically limits uninsured

motorist protection as to persons who would otherwise qualify as insured for liability purposes).[1]

There is no argument that the UIM Endorsement violates public policy because it contains

an exclusion that "specifically limits" uninsured motorist coverage to persons who would

otherwise qualify for coverage under the terms of the liability portion of the Policy. It is not void

per se. *See, e.g., Am Family Mut. Ins. Co. v. Federated Mut. Ins. Co.*, 775 N.E.2d 1198, 1204 (Ind.

Ct. App. 2002) (construing the definition of an insured in an uninsured motorist endorsement as

"any person occupying the insured vehicle" as an expansion of the policy's definition of an

---

[1] The issue in *Smith* was whether exclusionary language in an uninsured motorist provision was against public policy. The court found that because the exclusion appearing in the uninsured motorist section was identical to a provision in the liability section of the insurance policy, it did "not violate public policy because it only exclude[d] those already excluded under the liability section." 681 N.E.2d at 222 ("It does not exclude those who would otherwise qualify as insureds.") (citing *Whitledge*, 586 N.E.2d at 887).

insured). However, the UIM Endorsement may nevertheless violate public policy if application of the liability section definition of an "insured" to the facts of this case provides coverage for Jenkins, but the definition provided in the UIM Endorsement excludes coverage. For its part, Ohio Casualty disputes that there is any public policy that would require coverage under the facts of this case. It asserts the following:

> While there is case law holding that where an automobile liability policy covers an employer and its employees for bodily injuries arising out of the ownership, maintenance or use of an automobile, it is against public policy to exclude the employees from the coverage of the policy's uninsured motorist coverage, there is no case law which holds that an insurer may not reasonably limit its uninsured motorist coverage to parties who are strangers to the insurance contract to those instances in which those third parties were actually occupying an insured motor vehicle.

(Reply Brief of Pl. 3–4, ECF No. 38.) Ohio Casualty asserts that because Jenkins was not the policy holder or an employee of the policy holder, Jenkins was not driving a covered auto, the manner of operation of the covered auto was not a cause of the accident, and there was no contact between the covered auto and the uninsured motorist, Ohio Casualty was not required by public policy to provide uninsured motorist coverage beyond the clear and unambiguous terms of the UIM Endorsement. (*Id.* 4.) In making this argument, Ohio Casualty does not address the definition of an insured in the underlying Policy as one who, with the permission of the insured, is using the covered auto. Neither does it address whether this definition is as broad or broader than the definition of an insured provided in the UIM Endorsement.

The Court does not read the cases as narrowly as Ohio Casualty. The holding that, "if a person qualifies as an insured under the liability section of the policy, he must also qualify under the uninsured motorists section or the insurance contract violates public policy," *Smith*, 681 NE.2d at 222, does not distinguish between those who would otherwise qualify as an insured by virtue of

their status as an employee of an insured employer and those who may qualify under another definition of an insured. To the contrary, the public policy would appear to be the same in both instances; to place an insured in substantially the same position as if the other party had carried adequate insurance. It would make little sense to allow Ohio Casualty to do indirectly through differing definitions of the term "insured" what it cannot do directly through specific exclusions. Accordingly, the Court finds that Jenkins is entitled to uninsured motorist coverage if he fits either the definition of insured provided in the UIM Endorsement or in the Policy.

The Court will proceed by first addressing the language of the UIM Endorsement and determining whether Jenkins was covered directly under its terms. The Court will first analyze whether Jenkins fell within the explicit terms of the policy, specifically, whether he was "occupying" the dump truck at the time of the accident as required by the language of the UIM provision. If necessary, the Court will then analyze whether Jenkins was "using" the dump truck at the time of the accident with C. Lee's permission, making him an "insured" under the Policy, because public policy dictates that uninsured motorist provisions provide coverage to persons otherwise insured under a policy's liability provisions.

1.      *Occupying the Insured Dump Truck*

The Defendant urges the Court to find that Jenkins was occupying the dump truck because he was in close proximity to it, was using it as a work station, and was actively directing its driver. The Defendant does not indicate which manner of occupying included in the Endorsement definition Jenkins satisfied, that is, whether he was in, upon, getting in, getting on, getting out, or getting off the vehicle. The Court will consider each definition, remembering that they are intended

to define occupying. *Mich. Mut. Ins. Co. v. Combs*, 446 N.E.2d 1001, 1004 (Ind. Ct. App. 1983) (stating that because the function of the words and phrases "in," "upon," "entering into," and "alighting from" was to qualify or limit the meaning of "occupying," that they could not be appropriately construed without reference to that word).

a.    *In or Upon*

It is undisputed that Jenkins was standing a couple of feet behind the left side bumper of the covered vehicle when Shannon hit and killed him. Applying the common and ordinary usage of the terms, Jenkins was not *in* the C. Lee dump truck when he was struck and killed. Nor would it make any sense to argue as such; had he been in the truck when the uninsured motorist drove through the construction lane, he would not have been killed or injured because Shannon's vehicle did not come in contact with the C. Lee truck. The Court also finds that Jenkins was not *upon* the C. Lee truck. Indiana courts considering coverage under policies that defined occupying as being "in or upon, entering into, or alighting from" the automobile have construed the word upon to mean "to encompass physical contact with the covered vehicle." *Miller v. Loman*, 518 N.E.2d 486, 491 n.1 (Ind. Ct. App. 1987) (citing *United Farm Bureau Mutual Ins. Co. v. Pierce* 283 N.E.2d 788 (Ind. Ct. App. 1972), and *Mich. Mut. Ins. Co. v. Combs*, 446 N.E.2d 1001 (Ind. Ct. App. 1983)).

In *Pierce*, the plaintiff's automobile was stuck in the snow, and he got out to push it. As the plaintiff was pushing the car, he cut his fingers on the fender. 283 N.E.2d at 789. In reviewing cases from other jurisdictions construing similar insurance contract language, the court noted that the majority of "in or upon" cases "appear to rely primarily upon physical support." *Id.* at 790. Accordingly, and because the plaintiff was in physical contact with the vehicle, the court

determined that the plaintiff was upon his car when he cut his fingers. *Id.*

In *Combs*, the insured driver experienced engine problems with his VW. He left the car and sought help from his brother, whose place of employment was nearby. 446 N.E.2d at 1002. Twice the two left the disabled VW to obtain a part to repair the vehicle. As the insured's brother was working on the engine, stooped over the rear of the VW with his knees resting on the bumper, he was struck by an uninsured motorist. *Id.* The court noted that the *Pierce* court relied on the "physical contact" rule to find coverage, but also acknowledged that some courts had rejected a rule that mere pre-injury physical contact with a vehicle is sufficient to meet the upon definition of occupying. *Id.*at 1005. The court acknowledged that the facts facing the *Pierce* court had not required a limitation of the physical rule:

> The injured party in *Pierce* was the driver of the insured vehicle—he had been an "occupant" of the car and intended to drive away in it once it was freed of the snowbank. To afford coverage to the Pierce claimant was both equitable and reasonable in light of his intended "occupancy" as that word is commonly understood.

*Id.* However, the court thought the results reached by some courts that did not rely exclusively on the physical contact rule were equally understandable because, while there was no physical contact, there was "a sufficient relationship between the claimant and the car so that it could reasonably be said that the claimant was an 'occupant.'" *Id.* In each of these cases, however, the common denominator was that the recovering claimant "either was or was intended to be a passenger or operator of the insured vehicle." *Id.* at 1005–06; *see also id.* at 1007 (noting that coverage applied in these cases even where physical contact was absent because the claimants "maintained a close and substantial connection with occupancy and use of the insured vehicle"). Thus, in these cases it was "the claimant's *relationship* with the insured auto that determines whether the claimant was 'upon' the car so as to have been 'occupying' it for purposes of coverage." *Id.* at 1006. The court

concluded that, whether the physical contact rule or a claimant-vehicle relationship analysis was used to interpret the word upon, the claimant in *Combs* was entitled to coverage because he was both in physical contact with the VW and his actions evidenced a relationship with the vehicle and its operation. 446 N.E.2d at 1007.

Cases construing the "in or upon" language in Indiana's Guest Statute are also instructive. In *KLLM, Inc. v. Legg*, 826 N.E.2d 136 (Ind. Ct. App. 2005), the court, relying on *Combs*, found that a person could be considered to be "upon" a motor vehicle if a sufficient relationship existed between that person and the vehicle. *Id.* at 144. The court found that such a relationship existed between the claimant and the tractor-trailer he had been riding in even though he had exited the vehicle because he had only temporarily left the vehicle to assist the driver in backing up the tractor-trailer and thus his actions were in direct furtherance of their continued journey. The *KLLM* court distinguished a previous Indiana Guest Statute case, *C.M.L. ex re. Brabant v. Republic Services, Inc.*, 800 N.E.2d 200 (Ind. Ct. App. 2003). In that case, a nine-year-old child accompanied his stepfather on his garbage collection route. The child slept under a blanket in the passenger seat while his stepfather drove his route. At one particular stop, while his stepfather was collecting garbage, the child exited the vehicle without his stepfather's knowledge and urinated between the hydraulic tank and the cab of the truck. The stepfather reentered the vehicle and, assuming that his stepson was still asleep under the blanket in the passenger seat, began pulling the truck forward, injuring the child. *Republic Servs.*, 800 N.E.2d at 201–02. The court held that the child was not in or upon the garbage truck when he was struck. *Id.* at 209. The *KLLM* court stated that when the child exited the garbage truck to urinate, his actions were not in direct furtherance of his and his stepfather's journey and thus a sufficient relationship did not exist between the child

and the garbage truck to support a finding that he was upon the truck at the time of his injuries. 826 N.E.2d at 144.

Here, Jenkins was not in physical contact with the covered vehicle. He was not directing his attention to the vehicle in an attempt to render it operational or repair it like the claimant in *Combs*, and he did not intend to become an operator like the claimant in *Pierce*. Although Jenkins anticipated becoming a passenger, this was not to occur until the end of his shift. In the meantime, he was undertaking tasks that had no relation to being an operator or passenger of the truck and were not in direct furtherance of being transported to or from the work site. In fact, Jenkins had been performing these independent tasks for an hour and one-half before his death. The Court does not think that Jenkins's intended occupancy of the truck at some future point is sufficient to render Jenkins "upon" the dump truck at the time of his death. He had neither the requisite physical contact with or relationship to the C. Lee truck.


b.      *Getting In, On, Out, or Off*

Applying Indiana law, the Court finds that Jenkins was not getting in, getting out, getting on, or getting off of the dump truck, or otherwise in the process of doing so when Shannon struck and killed him. Indiana, in the case of *Miller v. Loman*, 518 N.E.2d 486 (Ind. Ct. App. 1987), rejected a test that considered only time and distance to determine an injured party's relationship to the insured vehicle in the context of determining whether a person is "alighting from" and "getting out of" an automobile. *Id.* at 491 ("We believe the proper determine of whether an individual is 'alighting from' or 'getting out' of an automobile requires the examination of several factors."). The test the court adopted analyzes the following four factors: (1) the distance between the

accident and the vehicle; (2) the time separating the accident and the exit of the vehicle; (3) the

individual's opportunity to reach a zone of safety; and (4) the individual's intentions in relation to

the automobile. *Id.* at 491. These factors "may establish the existence of a relationship between the

individual and the insured automobile." *Id.* However, these factors will "have greater or lesser

weight depending upon the circumstances of each individual case" and there "may be instances in

which one of the factors may be determinative." *Id.*

In *Miller*, the court concluded that a passenger who was struck by an uninsured motorist

after he had left the vehicle and walked about thirty feet away to kick a muffler to the side of the

road was not occupying the vehicle for purposes of the uninsured motorist provision. 518 N.E.2d at

492. The court considered it important that the passenger never intended to do anything but kick

the muffler off the road and return to the truck and, thus, never intended to reach a zone of safety.

Accordingly, he clearly embarked upon a course of conduct distinct from those acts necessary to

make an exit from the vehicle. *Id.*

Later, in *Lake States Insurance Co. v. Tech Tools, Inc.*, 743 N.E.2d 314 (Ind. Ct. App.

2001), the Indiana Court of Appeals was faced with deciding whether an individual, Mary, who

was struck by an uninsured motorist as she crossed a road to get to the insured vehicle was

"occupying" that vehicle, specifically, whether she was "getting in" the covered vehicle. The court

noted that determining whether a term was ambiguous required an analysis of the term's common

and ordinary usage. 743 N.E.2d at 320. The party seeking coverage, relying on the *Miller* factors,

argued that Mary's acts were directly connected with the insured vehicle and were essential to the

use of the vehicle because it was necessary for Mary to cross the street to reach the insured vehicle,

and that she was only sixty feet from the vehicle when she was struck. The court held that,

although the four factors enunciated in *Miller* were "instructive," that the "idea of extending coverage for individuals 'getting in' or 'occupying' to a 'zone' around the insured vehicle eviscerates the contractual language that defines 'occupying' a covered vehicle to mean 'in, upon, getting in, out or off.'" *Id.* at 321. The court further held that out of the four *Miller* factors, the distance from the vehicle—sixty feet— held particularly determinative weight in finding that Mary was neither occupying or getting in the vehicle. *Id.* The court concluded as follows:

> An examination of the dictionary definition of these terms certainly does not apply to an individual sixty (60) feet from the covered vehicle. Specifically, we hold that "getting in," means entering, requiring a closer proximity than sixty feet. Thus, we find that the term "occupying" is not ambiguous, and therefore, Mary's acts and geographic proximity of sixty feet do not fit within the policy language.

*Id.*

Applying *Miller* and *Tech Tools*, the Court finds that the Endorsement definition of occupying is not ambiguous and that Jenkins's actions do not fit within this definition. Jenkins's duties filling potholes, although they involved the use of the truck in close physical proximity, did not require that he occupy it. In fact, his duties specifically required that he remain outside the vehicle. One of the other factors, the distance between the accident and the covered vehicle, does not carry any significant weight in this case because the reason Jenkins remained close to the truck is not related to his occupying it. *See Miller*, 518 N.E.2d at 492 (recognizing that factors will "have greater or lesser weight depending upon the circumstances of each individual case"); *see also Combs*, 446 N.E.2d at 1004 (noting that the terms that define occupying cannot be construed without reference to that word). Rather, Jenkins was close to the truck only because he was performing a course of conduct (filling potholes) that was entirely distinct from those acts necessary to exit or enter the vehicle. In addition, the processes involved in effecting an entrance

into or exit from the vehicle, or effecting a mount or dismount from the vehicle, end or begin when the actor is inside the vehicle, *State Farm Mut. Auto. Ins. Co. v. Barton*, 509 N.E.2d 244, 248 (Ind. Ct. App. 1987), and Jenkins had last exited the truck 90 minutes before he was struck, and he did not intend to reenter it until after he completed his duties at the end of his shift. The Defendant argues that Jenkins's "intentions" regarding the truck "included using it as a work platform by controlling its direction and movement, shoveling cold-patch from it on a constant basis, and using it to go back and forth to the work site." (Def.'s Mem. of Law 13, ECF No. 28.) The only aspect of these intentions that actually relate to occupying the vehicle as defined in the Endorsement is the transport back and forth to the work site, but it is undisputed that Jenkins was not in the process of being transported to or from the work site when he was struck. Rather, as stated above, he was performing duties unrelated to becoming a passenger.

Finally, Jenkins was not attempting to reach a zone of safety. *See Barnhill v. Liberty Mut. Fire Ins. Co.*, 129 F. Supp. 2d 1192, 1198 (N.D. Ind. 2001) (holding that because the driver of a van had reached a zone of safety when he sat in a police vehicle on the berm of the highway, he was no longer occupying the van); *Auto-Owners Ins. Co. v. Powell*, 757 F. Supp. 965, 971–72 (S.D. Ind. 1991) (finding that a driver was not "alighting from" his van when, among other factors, he had an opportunity to reach safety as demonstrated by the fact that he walked south and away from the van), *aff'd on appeal*, 953 F.2d 646 (7th Cir. 1992). The Defendant notes, presumably in relation to the safety zone factor, that Jenkins remained in a work site on a public highway after exiting the truck. This statement fails to acknowledge that this work site, a specifically designated construction lane, was intended to be a safe area for the Walsh workers to accomplish their tasks

despite its location on a public highway.[2] A Crash Attenuator Truck outfitted with a large bumper drove behind Jenkins and his crew to provide protection from vehicles. Before construction began, a Roadsafe crew placed arrow boards, warning lights, and barrels to direct traffic out of the construction lane where Jenkins was working.

In conclusion, much like the court in *Tech Tools*, this Court finds the idea of extending coverage for individuals occupying a vehicle to a zone around the insured vehicle regardless of the last time they exited the vehicle or the reasons they maintained proximity to the vehicle would eviscerate the contractual language that defines occupying a covered vehicle to mean "in, upon, getting in, on, out or off." In construing a written insurance contract, a court may not extend insurance coverage beyond that provided in the contract or rewrite the clear and unambiguous language of an insurance contract. *Shelter Ins. Co. v. Woolems*, 759 N.E.2d 1151, 1155 (Ind. Ct. App. 2001). The Court concludes that an Indiana court considering the facts of this case would hold that a person who last exited a vehicle 90 minutes before an accident was not still in the process of getting out or getting off that vehicle, and would further conclude that his intention to occupy the vehicle after completing discrete tasks within a zone of safety did not constitute getting in or getting on the vehicle.

The Court does not find the definition of "occupying" in the Policy to be ambiguous. Applying the common understanding of the terms "in, upon, getting in, on, out or off," the Court

_____

[2] Much like the court in *Barnhill* did, this Court acknowledges that it may seem counterintuitive to find that Jenkins was in a zone of safety when he was in the construction lane since he was, after all, in that lane when he was struck and killed. "However, if that were controlling on the question of whether one had reached a zone of safety, the mere fact that there was [an] accident would perforce mean that the injured party was not in the zone of safety and hence was still getting out of the insured vehicle at the time of the incident." 129 F. Supp. 2d at 1198 n.11. "Such a conclusion would, of course, render the zone of safety inquiry a nullity." *Id.*

further concludes, as a matter of law, that Jenkins was not an occupant of the C. Lee dump truck when he was struck and killed by an uninsured motorist on March 16, 2010.

**2.**      *Using the Insured Dump Truck*

Even though there is no coverage for Jenkins directly under the terms of the Endorsement, the Court must still consider whether Jenkins would otherwise be considered an insured under the terms of the liability policy underlying the Endorsement. A person is an "insured" for liability purposes if that person is "using with [C. Lee's] permission a covered 'auto' [C. Lee] own[s], hire[s] or borrow[s]." (Policy, Section II-Liability Coverage, ECF No. 28-5 at 25.)[3] The Policy provides coverage for all sums that an insured legally must pay as damages because of bodily injury or property damage to which the Policy of insurance applied, "caused by an accident and resulting from the ownership, maintenance, or use" of a covered auto. (Policy, Section II-Liability Coverage, ECF No. 28-5 at 25.)

Ohio Casualty argues that Jenkins was not a named insured or an employee of a named insured and that the manner in which the covered auto was being operated did not cause or contribute to the accident and Jenkins's death. However, whether Jenkins was using the dump truck as that term is contemplated in the Policy is distinct from the issue of causation. *See Argonaut*

---

[3] However, this excludes anyone, other than an "employee, . . . lessee or borrower or any of their employees, while moving property to or from a covered 'auto.'" (Policy, Section II-Liability Coverage, ECF No. 28-5 at 26.) Jenkins was not a C. Lee employee. Thus, with respect to his accident, if it occurred while he was unloading the truck, coverage is provided only if Jenkins was the employee of a borrower or lessee and the cold patch is considered property. The Plaintiff, in arguing that coverage does apply, has ignored the language regarding a borrower or lessee. This Court is convinced, based on its review of the record and the case law cited by the Defendant, that, at the very least, genuine issues of material fact preclude a finding that this exclusion applies to Jenkins. Accordingly, and because other issues prove to be dispositive, the Court does not rely on this exception from the definition of an insured in deciding the pending Motions.

*Ins. Co. v. Jones*, 953 N.E.2d at 618 (noting that the Indiana Court of Appeals has differentiated between use and causation to determinate whether a claimant's action were covered by the term "use"); *but see Lumbermans Mut. Ins. Co. v. Statesman Ins. Co.*, 291 N.E.2d 897, 899 (Ind. 1973) ("We are of the opinion that what was intended by the words in the contract, 'arising out of the ownership, maintenance or use' of the truck as applied to unnamed insureds is synonymous to being *caused* by the use of the truck (including the loading and unloading).")

Defendant argues that Jenkins was using the dump truck in a manner reasonably contemplated by C. Lee and Ohio Casualty. Even if Jenkins made use of the truck in a proper and foreseeable manner, it may not be the kind of activity that qualifies as "use" under Indiana law. The Indiana Court of Appeals has stated that its case law defines "use" as "to drive, operate, or direct the vehicle." *Estate of Sullivan v. Allstate Ins. Co.*, 841 N.E.2d 1220, 1225 (Ind. Ct. App. 2006) (holding that merely being a passenger in a car does not constitute use). It is undisputed that Jenkins was not driving or operating the C. Lee truck at the time of the accident and, in fact, at no time had he been the operator or driver. Thus, he does not meet the definition of an insured by virtue of permissive use of the truck unless he exercised sufficient control over it. *Estate of Sullivan*, 841 N.E.2d at 1225; *see also Protective Ins. Co. v. Coca-Cola Bottling Co.*, 467 N.E.2d 786 (Ind. Ct. App. 1984). In *Protective*, the court considered whether Coca-Cola Bottling Company was using a vehicle by directing its location during unloading so as to qualify as an omnibus insured. Finding no Indiana law on point, the court began by looking to other jurisdictions for cases where control over a vehicle, by someone other than a driver or passenger, was "so closely related to its operation to be equivalent of use." 467 N.E.2d at 789. The court cited two cases with approval:

In *Insurance Co. of N. America v. Royal Globe Ins. Co.*, (1981) 30 Wash. App. 78, 631 P.2d 1021, an equipment company hired a trucking company to haul a backhoe from one town to another. The trucking company supplied a tractor-trailer and a driver for the job. An equipment company employee followed the tractor-trailer in a flag car supplied with a radio and gave directions and signals to the driver to assist him in guiding the backhoe. A lawsuit ensued because the boom section of the backhoe struck an overpass. Construing an omnibus clause identical to the one before us, the Washington Court of Appeals found that, while it is "probably impossible to formulate an exact measure of the degree of control" which must be exercised in order to bring the person exercising the control within the scope of the omnibus clause, the giving of signals to the actual operator of the vehicle did constitute "use". . . .

Similarly in *Woodrich Construction Co. v. Indemnity Insurance Co.*, (1958) 252 Minn. 86, 89 N.W.2d 412, a general contractor was held to be an additional insured under a subcontractor's auto policy because the general contractor's employees gave arm and hand signals to direct the movement of the subcontractor's truck driver. Their directions resulted in injury to one of their employees.

The language used by the court stressed the necessity of active control:

"if as an incident of and in the furtherance of his construction work, a general contractor assumes active control or guidance of a backward movement of a truck provided by a subcontractor, and his negligence in the exercise of that control and guidance is a proximate cause of the accident, a general contractor thereby participates in the operation of the truck to such an extent as to be a user of the vehicle."
*Id.* at 94, 89 N.W.2d at 418.

*Id.* at 789–90. The *Protective* court reasoned that unlike the situation before it, "both *Woodrich* and *Insurance Co. of N. America* involved actual direction of the vehicle's movements at the time of the accident. Each party afforded coverage 'assumed active control or guidance' of the vehicle." *Id.* at 790. The court concluded that Coke's dispatcher did not actively control, guide, or direct the movement of the leased vehicle at the crucial moment, when the truck was being disconnected. Rather, at that time, Coke's control was only passive and did not constitute use because the term use as set forth in the omnibus clause suggested activity that "assists in propelling or directing the vehicle to a place where it ceases to be employed." *Id.* (concluding that the words use, user, and actual use restricted coverage to those persons who have some active, direct relationship with the

insured vehicle); *see also Miller*, 518 N.E.2d at 492 (holding that a passenger who exited a car to kick a muffler off the side of the road was not insured because "use" of a vehicle means an activity "that assists in propelling or directing a vehicle to a place where it ceases to be employed," which the passenger had not been doing "[e]ven while he was still in the truck" much less "when he was thirty feet from the truck").

Jenkins's only direction to Teslow, the driver of the truck, was to tell him when he had completed repairs on a section of highway so that Teslow could move the dump truck, at about five miles per hour, to the next area of the highway that was in need of repair. If Teslow did not see Jenkins's hand signals to pull ahead because he was not paying attention, Jenkins would verbally get Teslow's attention. Jenkins would then indicate when to stop. Jenkins's actions certainly did not amount to assistance in propelling the dump truck, of which Teslow was in complete control as the driver. Neither did Jenkins's actions assist Teslow in directing the truck to a place where it would cease to be employed as Teslow was not relying on Jenkins to guide the truck through any particular hazard, but simply to inform him when the crew was ready to repair the next section of highway. This was not active control or guidance, but mere passive control.

The Defendant cites to *Monroe Guaranty Insurance Co. v. Campos*, 582 N.E.2d 865 (Ind. Ct. App. 1991), in support of its position that Jenkins was using the C. Lee truck. In *Campos*, the court held that a tow-truck operator was using his truck within the terms of the policy when he was struck by a motorist as he exited a police vehicle intending to walk back to his tow truck. The insurer claimed that Campos was not using the insured tow truck at the time of the accident within the terms of the policy. The *Campos* court disagreed, concluding that even though Campos was not inside the insured vehicle at the time of the accident, he had a more "active" relationship to the

insured vehicle than someone who is a mere passenger, as in *Miller*. The court also focused on the nature of the insurance policy at issue, noting that it insured against accidents resulting from garage operations. Thus, the court framed the question as whether Campos was using the tow truck within the scope of garage operations although he had ceased to propel the vehicle. *Id.* The court concluded, based on the following, that Campos was using the tow truck at the time of the accident:

> The contract between Monroe and Allen Towing provides insurance coverage to Allen Towing and its employees who are engaged in the business of towing disabled vehicles. The parties certainly would have contemplated the nature of this business activity. Removal of disabled vehicles from roadways cannot be accomplished solely by the activity of "propelling or directing" the towing vehicle. Reasonable persons would expect that a tow truck operator must engage in other activities during the towing process, some of which will require that he exit the vehicle (e.g. evaluation of the towing scene, securing the vehicle to be towed, attachment of towing equipment to the disabled vehicle, conferring with appropriate officials concerning safety procedures).

*Id.* at 870.

*Campos* is distinguishable from the case before the Court because Campos had previously been actively exercising control over a vehicle but ceased to be propelling it at the time of the accident, whereas Jenkins never had control over the dump truck. At all times, Teslow was the driver. In addition, the policy at issue in *Campos* provided coverage for garage operations and the contemplation of the parties was that it would cover all activity reasonably necessary to tow disabled vehicles. The Policy at issue here is an automobile liability policy for a business (C. Lee) that is described in the Policy as engaged in excavating. Jenkins was not an employee of the insured business. There is no indication that the parties would have contemplated insuring someone like Jenkins who never operated the truck for excavating or otherwise, whose actions were not essential to the operation of the truck, and who performed all of his work outside the truck.

23

Although the truck became a necessary tool for Jenkins to complete his duties filling potholes, if that criteria alone were enough, coverage would be extended beyond the intention of the contracting parties. For example, Jenkins could also be said to have been using the Crash Attenuator Truck, despite having no contact with it or control over it, as it was necessary for his job. In addition, *Campos* distinguished *Miller* as involving a mere passenger, but it is not clear how Jenkins was so different than a passenger. It can be said that the vehicle in which a passenger is riding has become a necessary tool to get from one location to another, but the Indiana Court of Appeals has determined that this is not use because the passenger does not assist in propelling or directing the vehicle to a place where it ceases to be employed. *Miller*, 518 N.E.2d at 492. Jenkins's actions were only slightly more closely related to the dump truck's "operation" than a passenger's activities are so related, which is not close enough to equate to use.

In this same vein, *Argonaut* is distinguishable. The *Argonaut* court recognized that the "whether there is an 'active' relationship between the claimant and the vehicle, and the reasonable expectations of the parties upon entering into the insurance agreement are crucial questions to answer in determining coverage issues." 953 N.E.2d at 619 (internal citations omitted). Under this standard, the court concluded that a sheriff's department deputy who responded to the scene of a slide-off and parked her police vehicle in a manner to assist her in directing traffic and securing the scene was using her vehicle in a manner contemplated by the parties. The court stated that it was not the deputy's distance from her vehicle or time away from her car directing traffic that was determinative, but whether she was "in some active relationship to the vehicle at the time of the collision," and the insurance company had not designated any evidence that the deputy's actions with relation to her patrol car were inconsistent with using the car for controlling traffic around the

slide-off site or were anything other than central to that purpose. *Id.*

This analysis is highly fact sensitive. Although Jenkins's actions with relation to the dump truck were not inconsistent with using it for road construction, specifically filling potholes, unlike the deputy, Jenkins never had active control of the dump truck. He did not drive it to or from the worksite. Teslow, the insured's employee, was the driver at all times. The deputy, in contrast, had clearly been using the vehicle prior to positioning it to control the scene. The *Argonaut* court also concluded that the deputy's relationship to her patrol car when the uninsured driver collided with her was clearly within the contemplation of the parties to the policy—the Monroe County Board of Commissioners and the insurance company. *Id.* at 620. The court reasoned that the insurer "agreed to insure a government body that employs law enforcement officers who are regularly called upon to control traffic and assist in the resolution of automobile accidents. Use of these vehicles is common—indeed, expected—and part of the training of law enforcement officers." *Id.* Although C. Lee purchased insurance to protect itself and those it allowed to drive, control, and direct the trucks it owned, it is not clear that C. Lee or Ohio Casualty intended to extent this coverage to the employees of construction contractors who might hire C. Lee to haul materials and transport workers to a job site. The relationship of these third parties to the covered vehicle and the expectation of the parties to the insurance contract does not support a finding that Jenkins was using a covered auto as contemplated in the liability Policy.

The Court concludes that Indiana courts would hold that Jenkins was not using or occupying the C. Lee dump truck, and thus there can be no coverage under the Policy and the UIM Endorsement.

## C.     Uninsured Motorist Coverage Under Indiana Code

The Commercial Umbrella Policy that Ohio Casualty issued to C. Lee does not, on its face,

apply to the Defendant's claim. In March 2010, when Ohio Casualty issued the Policy to C. Lee,

Indiana Code § 27-7-5-2 provided that an insurer was required to make available in its motor

vehicle liability policies UM (underinsured motorist) and UIM (uninsured motorist) coverage,

except as provided in subsection (d). Subsection (d) stated

> An insurer is not required to make available the coverage described in subsection (a)
> in a commercial umbrella or excess liability policy, including a commercial umbrella
> or excess liability policy that is issued or delivered to a motor carrier (as defined in IC
> 8-2.1-17-10) that is in compliance with the minimum levels of financial responsibility
> set forth in 49 CFR Part 387.

Despite the statutory language creating an exception for umbrella policies issued to motor carriers,

the Defendant argues that the statute imputes UM coverage to the Ohio Casualty's Commercial

Umbrella Policy. The Defendant relies on language in the public law containing the 2009

amendment to § 27-7-5-2 in support of its argument that Ohio Casualty was required to provide

UM coverage in the Commercial Umbrella liability policy issued to C. Lee. A history of the

amendment to the UM statute is required to understand the Defendant's position, so the Court now

turns to that history.

As originally enacted, Indiana Code § 27-7-5-1 mandated that insurance carriers offer

uninsured motorist coverage in an amount equal to Indiana's minimum financial responsibility

requirements. *Lakes v. Grange Mut. Cas. Co.*, 944 N.E.2d 509, 517 (Ind. Ct. App. 2011) (setting

forth the history of Indiana's uninsured and underinsured motorist statute). In 1982, the Indiana

legislature replaced the statute with Indiana Code § 27-7-5-2, which required that insurers not

merely offer but provide uninsured motorist coverage in an amount equal to the minimum financial

responsibility requirements (but not exceeding the bodily injury and property damage limits) of the insured's policy. Acts 1982, P.L. 166, Sec. 1; *Lakes*, 944 N.E.2d at 517. In 1987, the Legislature broadened the scope of the statute by requiring insurers to provide underinsured motorist coverage in addition to uninsured motorist coverage. P.L. 391-1987, Sec. 1, eff. Jan. 1, 1988; *Lakes*, 944 N.E.2d at 517. This amendment also mandated that insurers provide coverage in limits equal to the limits of liability specified in the bodily injury and property damage provisions of an insured's policy. *Lakes*, 944 N.E.2d at 517. Insureds were also allowed to purchase coverage in excess of those limits, thereby transforming the act into a "full recovery" statute. *Id.* In 1994, amendments to the statute corrected what the Indiana Supreme Court and Indiana Court of Appeals had dubbed as illusory coverage in circumstances where a vehicle was insured for less than the minimum statutory amount by prohibiting insurers from providing underinsured motorist coverage with a limit of less than $50,000. P.L. 130-1994, Sec. 41 & P.L. 116-1994, Sec. 56. In 1999, the Indiana Supreme Court held in *United National Insurance Co. v. DePrizio*, 705 N.E.2d 455 (Ind. 1999), that the uninsured/underinsured motorist statute applied to all umbrella policies that provided third party auto liability coverage. The court concluded that, unless the legislature created an explicit statutory exemption, an excess liability policy that afforded coverage for liability from ownership or use of a covered vehicle was a "motor vehicle liability policy" under the statute. *DePrizio*, 705 N.E.2d at 458–59. Accordingly, umbrella policies were required to provide UM coverage. *Id.* In response, in 2005, the Indiana legislature amended the statute yet again, codifying at Indiana Code § 27-7-5-1.5 the explicit exception *DePrizio* had indicated was necessary as follows:

27-7-5-1.5 Commercial Vehicle policy

(b) This chapter does not require an insurer to make available uninsured motorist or underinsured motorist coverage described in section 2 [IC 27-7-5-2] of this chapter in

connection with the issuance of a:

\* \* \*

(1) commercial liability policy, including a commercial vehicle policy;

(2) commercial umbrella or excess liability policy.

In 2009, the Indiana legislature again amended the statute with respect to the application of UM/UIM coverage in commercial vehicle policies. Public Law 124-2009 repealed Indiana Code § 27-7-5-1.5, effective January 1, 2010, and amended Indiana Code § 27-7-5-2, effective July 1, 2009. The amendment created the statute that was in effect when C. Lee's policy was issued. In addition to making code amendments, Public Law 124-2009, Section 2(c), contained "non-code" provisions. One such provision provided:

> Notwithstanding the effective date of the section of this act amending IC 27-7-5-2, an insurer shall make available to the policyholder of a commercial vehicle policy that is in effect before and on January 1, 2010, uninsured motorist coverage and underinsured motorist coverage as required by IC 27-7-5-2, as amended by this act, on the date of the first renewal of the commercial vehicle policy that occurs after December 31, 2009.

P.L. 124-2009, Sec. 2(c).

The Defendant argues that the legislature intended the 2009 amendment to undo the blanket exception given to all commercial vehicle policies to the UM coverage otherwise required by the statute. It argues that, under the new provisions, insurance companies are not required to make UM coverage available in a commercial umbrella policy, *see* Ind. Code 27-7-5-2(d), but they are required to make UM coverage available to a policyholder of a commercial vehicle policy that was in effect before and on January 10, 2010, on the date of the first renewal after December 31, 2009. Ohio Casualty asserts that the non-code provision cited by the Defendant only requires coverage as "required by I.C. 27-7-5-2, as amended by this Act," and that the amendments include subsection (d), which specifically states that an insurer is not required to make available UM/UIM coverage in a commercial umbrella policy. Ohio Casualty argues that the purpose of the non-code provision

28

was to require insurers to offer primary UM/UIM coverage in policies renewed after December 31, 2009, because such coverage had not been required by statute the previous five years. Ohio Casualty contends that the Defendant's interpretation would require insurers to follow an uncodified statute to provide UM/UIM coverage in commercial umbrella policies even though the codified versions of the statute, both before and after the 2009 amendment, did not require such coverage. The Court agrees with Ohio Casualty that this interpretation is contrary to the clear language of the statute. Moreover, the non-code provision does not specifically refer to commercial umbrella or excess liability policies, but only to commercial vehicle policies. The Court therefore holds that Ohio Casualty was not required by operation of law to extend UM coverage in the Commercial Umbrella Policy issued to C. Lee.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff Ohio Casualty's Motion for Summary Judgment [ECF No. 25] and DENIES Defendant Laura Herring-Jenkins' Motion for Summary Judgment [ECF No. 27]. The Clerk is directed to enter judgment in favor of the Plaintiff declaring that:

(1)      No uninsured motorist coverage is afforded under the Plaintiff's business automobile policy, Policy No. BAO 54439-84, for the claims asserted by the Defendant for damages arising out of the death of Christopher D. Jenkins occurring on March 16, 2010; and

(2)      No uninsured motorist coverage is afforded under the Plaintiff's commercial umbrella policy, Policy No. USO 54439084, for the claims asserted by the Defendant for damages arising out of the death of Christopher D. Jenkins occurring on March 16, 2010.

SO ORDERED on November 18, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION